Matter of Avigdor (2023 NY Slip Op 04589)

Matter of Avigdor

2023 NY Slip Op 04589

Decided on September 13, 2023

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on September 13, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
FRANCESCA E. CONNOLLY, JJ.

2021-07122 

[*1]In the Matter of Morton M. Avigdor, an attorney and counselor-at-law. Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts, petitioner; Morton M. Avigdor, respondent. (Attorney Registration No. 1948413)

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on August 1, 1984.

Diana Maxfield Kearse, Brooklyn, NY (Thomas Graham Amon of counsel), for petitioner.
Morton M. Avigdor, Brooklyn, NY, respondent pro se.

PER CURIAM.

OPINION & ORDER
The Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts served the respondent with a notice of petition and a verified petition, both dated July 21, 2021, containing four charges of professional misconduct. The respondent served and filed a verified answer dated October 4, 2021, in effect, denying the charges and asserting two counterclaims. Subsequently, the Grievance Committee served and filed a statement of disputed and undisputed facts dated October 6, 2021, which was not challenged by the respondent. By decision and order on application dated December 2, 2021, this Court referred the matter to David I. Ferber, as Special Referee, to hear and report. A pre-hearing conference was held on April 5, 2022. Prior to the hearing scheduled for July 18, 2022, the respondent filed a separate motion, inter alia, to strike and dismiss the petition and stay the Grievance Committee's proceedings before the Special Referee. A hearing was conducted on July 18, 2022, at which the respondent failed to appear. In a report dated September 20, 2022, the Special Referee sustained all four charges in the petition. The Grievance Committee now moves to confirm the Special Referee's report, impose such discipline upon the respondent as the Court deems just and proper, and to grant such further relief as the Court deems just and proper. The respondent submits an affirmation in opposition.
Separate motion by the respondent, inter alia, to (1) strike the petition as a sanction pursuant to CPLR 3126 based on the Grievance Committee's failure to provide discovery; (2) dismiss the petition under CPLR 3211(a)(8) for the Grievance Committee's failure to properly serve the respondent; (3) stay the Grievance Committee's proceeding before the Special Referee pending a full and complete response from the Grievance Committee to the discovery demands by the respondent; and (4) for such further relief as this Court deems just and proper.
In view of the evidence adduced at the hearing, we find that the Special Referee [*2]properly sustained all four charges. Further, based upon the motion papers and the papers in opposition, the respondent's separate motion is denied.
The Petition
Charges one, two, and four allege that the respondent misappropriated funds entrusted to him as a fiduciary incident to his practice of law from his IOLA account at TD Bank (hereinafter IOLA account), for his own use and benefit, in violation of rule 1.15(a) of the Rules of Professional Conduct (22 NYCRR 1200.0).
Specifically, for charge one, in 2017, the respondent represented his brother-in-law,
Isaac Goldbrenner, in the sale of an estate property located at 811 Avenue L in Brooklyn to Rabbi Meyer Landau. On March 8, 2017, the respondent deposited $126,000 into his IOLA account, which represented the down payment for this Goldbrenner/Landau transaction. The closing for the Goldbrenner/Landau transaction was held on July 10, 2017. Between March 8, 2017, and July 7, 2017, the down payment funds were the only client funds in the respondent's IOLA account. During the same period, the respondent issued five checks from the IOLA account totaling $39,500, all unrelated to the Goldbrenner/Landau transaction. Two of the checks, totaling $21,000, were deposited into the respondent's personal account at TD Bank. Prior to depositing one of the checks into this personal account on April 7, 2017, the respondent's personal account had a negative balance on April 6, 2017. By July 7, 2017, the balance in the respondent's IOLA account had decreased to $86,573.95, when the respondent should have been holding $126,000 for the Goldbrenner/Landau transaction.
For charge two, on July 10, 2017, the day of the closing for the Goldbrenner/Landau transaction, $1,133,750.30 from the sales proceeds were deposited into the respondent's IOLA account. Between July 11, 2017, and July 31, 2017, the respondent issued from the IOLA account four checks (payable to himself) totaling $600,000, and deposited those checks into his personal account. Throughout July 2017, the respondent transferred $600,000 from his personal account into his online brokerage account with Options Express, through which the respondent made personal investments. By July 31, 2017, prior to the distribution of any sales proceeds, the respondent's IOLA account balance was $620,324.25, well below the amount he was required to maintain for the Goldbrenner/Landau transaction. On November 6, 2017, the respondent issued another check to himself for $25,000 from the IOLA account, deposited the check into his personal account, and used the funds for personal expenses.
Charge three alleges that the respondent issued checks from the IOLA account, knowing there were insufficient funds in the account, in violation of rule 8.4(h) of the Rules of Professional Conduct. Specifically, on October 3, 2018, the respondent issued from the IOLA account three checks related to the Goldbrenner/Landau transaction, check numbers 144, 145, and 146, each in the sum of $13,000. The respondent knew that there were insufficient funds in his IOLA account when he issued the checks as the account balance was only $868.74.
Charge four involves a separate real estate transaction where the respondent served as an escrow agent. In December 2018, the respondent's friend, Jeffrey Lubin, entered into a real estate sales contract to sell his home in West Hempstead. Since Lubin was representing himself in the sale, the parties agreed that the respondent would hold the buyer's down payment in the repsondent's IOLA account until the closing on December 31, 2018. On December 7, 2018, the respondent deposited $40,000 representing the down payment for this transaction into his IOLA account. On December 26, 2018, the balance of the respondent's IOLA account fell to $27,083.74, $12,916.26 below what he was required to maintain for this transaction.
The Hearing Evidence
The Grievance Committee submitted various documents to prove its case-in-chief, including the records from the respondent's bank accounts and transcripts of the respondent's examination under oath (hereinafter EUO) conducted on December 22, 2020. During his EUO, the respondent testified that Landau was his close friend and exercise partner, and that Lubin was the respondent's best friend. From the Goldbrenner/Landau down payment held in the respondent's IOLA account, the respondent issued check number 98 for $2,500 to himself on March 10, 2017, prior to the closing of the transaction, purportedly for the respondent's legal fees. The respondent issued another check, number 100, for $10,000, dated March 30, 2017, from the IOLA account, also purportedly for the respondent's legal fees. On April 7, 2017, the respondent issued check number 99 for $15,000 to himself from the IOLA account, which the respondent testified was for his "commission." When asked what the commission was for, the respondent testified that he thought [*3]that the commission was for "pushing this deal through." According to the bank statements admitted as part of the record, the respondent's personal account balance was negative $6,987.48 on April 6, 2017. On April 7, 2017, after the respondent deposited a $15,000 check issued from the IOLA account, the respondent's personal account balance was $7,877.52. On July 6, 2017, the respondent issued check number 176 from the IOLA account, for $6,000, payable to his wife, Rifka Avigdor. The respondent testified that he could not recall the purpose of this payment. On July 7, 2017, the respondent issued check number 151 for $6,000 to himself from the IOLA account. The respondent testified that he also could not recall the purpose of this payment. On November 6, 2017, the respondent issued check number 132 for $25,000 to himself from the IOLA account. Again, the respondent testified that he could not recall the purpose of this payment.
The respondent did not dispute taking the funds from his IOLA account for his personal use, including four checks totaling $600,000 for his personal investment, but the respondent testified that he used the funds with permission from Landau and Goldbrenner. The respondent was directed repeatedly to submit detailed affidavits to support this claim. Instead, the respondent submitted four letters, two from Landau and two from Goldbrenner. None of the letters submitted indicated that the parties were aware of the amount of funds the respondent took from their real estate transaction. The respondent also was directed to produce the real estate closing statement for the Goldbrenner/Landau transaction, and he testified that he was unable to do so because he did not have access to it.
On December 26, 2018, a check for $13,000 for the Goldbrenner/Landau transaction cleared against the $40,000 down payment for the West Hempstead transaction, which was being held in the respondent's IOLA account. A deposit slip dated Saturday, December 29, 2018, indicated that a $13,000 cash deposit was made which was credited on Monday, December 31, 2018, to bring the balance of the IOLA account up to $40,083.74. When asked at the EUO whether Lubin was aware that the $40,000 down payment had been invaded, the respondent merely answered that he would obtain a statement from Lubin to demonstrate that the respondent acted with Lubin's authorization. Again, no such evidence was submitted.
The respondent also admitted at his EUO that he issued three checks for $13,000 each from his IOLA account even though he knew there were insufficient funds, but stated that it did not trouble him to do so because he had instructed Goldbrenner not to distribute the checks.
In his report sustaining all four charges, the Special Referee noted that although the
hearing date was changed to accommodate the respondent, he failed to appear at the hearing and attempts to contact him were unsuccessful.
Findings and Conclusion
In view of the evidence adduced at the hearing, we find that the Special Referee properly sustained all charges. Accordingly, the Grievance Committee's motion to confirm the report of the Special Referee is granted.
In determining an appropriate measure of discipline, we consider the respondent's failure to appear for the hearing and his disregard of the disciplinary proceeding to be a significant aggravating factor. Moreover, by doing so, the respondent did not avail himself of the opportunity to present evidence in mitigation, including any credible evidence that he had permission from the parties to withdraw funds from the IOLA account. Although one letter from Goldbrenner contained a notary stamp and a signature purportedly from the notary, it did not contain a jurat or other indication that the statements contained therein were sworn or made under penalty of perjury (see CPLR 2309[b]; Slavenburg Corp. v Opus Apparel, 53 NY2d 799, 801 n *; Lillo-Arouca v Masoud, 163 AD3d 646, 647; see also U.S. Bank N.A. v Langner, 168 AD3d 1021).
Under the totality of the circumstances, we find that disbarment is warranted (see
Matter of Herbert, 206 AD3d 114).
The respondent's separate motion is denied as meritless and moot. The respondent's
counterclaims are dismissed for lack of subject matter jurisdiction on the Court's own motion (see Schaffer v Evans, 57 NY2d 992).
LASALLE, P.J., DILLON, DUFFY, BARROS and CONNOLLY, JJ., concur.
ORDERED that the Grievance Committee's motion to confirm the Special Referee's report is granted; and it is further,
ORDERED that the respondent's motion is denied; and it is further,
ORDERED that, on the Court's own motion, the respondent's counterclaims are dismissed for lack of subject matter jurisdiction; and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Morton M. Avigdor, is disbarred, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, Morton M. Avigdor, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, the respondent, Morton M. Avigdor, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Morton M. Avigdor, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Acting Clerk of the Court